UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

vs.                                                        Case No. 07-cr-118

WAYNE RUOHO,

        *Defendant.*

---

## MOTION FOR COMPASSIONATE RELEASE

Wayne Ruoho, by counsel, files this motion under 18 U.S.C. § 3582(c)(1)(A) for resentencing and respectfully requests a time-served sentence.

In 2008, Wayne Ruoho was sentenced to 28 years' imprisonment for his role in a large methamphetamine conspiracy. At sentencing, Ruoho was obese but otherwise healthy. PSR ¶¶100–01. Now 53 and with well over 12 years of imprisonment under his belt, Ruoho is morbidly obese and he is not at all healthy—he is in remission from cancer and has other health problems, and he's a high risk for complications or death from COVID-19. And it is beyond dispute that incarcerated persons face a significantly higher risk of infection than the general public. Ruoho's health problems in the midst of a public health crisis provide an extraordinary and compelling basis for relief; he does not presently present a danger to the public; and he has a solid release plan in the home of his common-law. Thus, he asks the Court to reduce his sentence to "time served."

## BACKGROUND

In 2008 Wayne Ruoho pled guilty to conspiracy to possess with intent to distribute more than 500 grams of methamphetamine between 2001 and 2004. In the late 1990s, Ruoho and two other men, Ryan Dougherty and James Bruflodt, became partners in a drug enterprise in which they imported methamphetamine from California to Minnesota and then distributed the meth (through others) in Minnesota and Wisconsin. PSR ¶¶14–15, 18. Based on co-conspirators' statements, the Court attributed 5–15 kilograms of meth to Ruoho as relevant conduct. Statement of Reasons at 4. When Ruoho was sentenced, this gave him base offense level 36, which was increased to 41 based on evidence that he had possessed a gun (in case of robbery) and on his role as a leader/organizer (in partnership with Dougherty and Bruflodt). PSR at ¶¶ 68–71; Statement of Reasons at 4. The Court did not grant him any acceptance-of-responsibility reduction because he'd frivolously contested possessing a firearm (through his attorney). This resulted in a guideline range of 360–life. PSR at ¶¶75, 125. The Court noted at sentencing that Ruoho's offense was very serious but it appeared to be the result of dual addictions to gambling and cocaine. Statement of Reasons at 4. Also, the conspiracy ended in 2004, nearly four years before sentencing, and Ruoho had led a law-abiding lifestyle since then, so the Court imposed a just-below-guideline sentence. *Id.*

Ruoho did not appeal the judgment but he filed a pro se § 2255 motion in 2009, arguing that his attorney was ineffective for not objecting to the calculation of Ruoho's criminal history score. R.41 at 4. Ruoho's explanation of the error is

2

confusing but it appears that he was correct that there actually was an error.[1] But although it would have lowered the criminal history category from V to IV, it would not have made a difference in the guideline range—because the frivolous objection to the firearm enhancement resulted in the loss of an acceptance-of-responsibility reduction—and ultimately Ruoho voluntarily withdrew his § 2255 motion. R.43, R.44.

Both before and after Ruoho filed the § 2255 motion, he pleaded with the Court for assistance getting a Rule 35 sentence reduction; he explained that he was providing information to authorities but his attorney was not helping him get any credit for it. R.42, R.45. The Court responded that without a motion from the government, there was nothing it could do. R.46. Ruoho's attorney (Barry Voss) was later disbarred for ethical violations.[2]

In 2014, Ruoho sought a sentence reduction based on a retroactive guideline amendment, but because post-amendment, the applicable range was still 360–life, the Court denied the motion. R.47. In his motion, Ruoho explained to the Court

---

[1] The PSR assigned 3 points to the convictions listed at paragraphs 80 and 90, although the sentence in both (imposed after revocation of probation in both) was 366 days—a year and a day, not a year and a month—so they should have been assigned 2 points. *See* U.S.S.G. §4A1.2(e). It would appear that the probation office made this error because in both cases, Ruoho also served some jail time as a condition of probation; so the probation office likely added together the condition time and revocation time to reach 390 days (a year and a month). But if Minnesota credits probation-related jail time to the sentence imposed after revocation of probation (as Wisconsin does), then the probation-related jail time would not increase the sentence beyond 366 days. And the details of the cases indicate that they do just that, since the state court imposed two 366-day revocation sentences on 7/7/93; then one of them expired 2/11/94, the other expired 5/4/94. PSR ¶¶80–81.

[2] https://www.startribune.com/prominent-minneapolis-attorney-barry-voss-disbarred-for-misconduct/208524751/

3

that he had a good prison job performance record, had completed the carpentry apprenticeship and helped teach others carpentry; he had completed many educational programs; he was a lead mentor in the BOP Youth Mentor Program; and he was a member of the suicide companionship team. R.47 at 8–9; 47-2 (letter). He also noted that he had bladder cancer, gall bladder disease, and hepatitis. *Id.* But again, given the rules governing sentence reductions based on guideline amendments, there was nothing the Court could do. *See* U.S.S.G. § 1B1.10.

Finally, it is worth noting in this background section that although numerous others were sentenced for participating in the same conspiracy, at this point, everyone but Ruoho has been released. *See* PSR ¶¶6–11. His partners in running the conspiracy, Dougherty and Bruflodt, were apparently never indicted for their role in the conspiracy; they had other federal drug cases in the 2000s out of the District of Minnesota, which may have overlapped with the conspiracy that Ruoho was involved with, but they were both released from federal prison for those offenses a long time ago. *See* https://www.bop.gov/inmateloc/; *see also United States v. Dougherty*, 04-cr-451 (D. Minn.); *United States v. Dougherty*, 05-cr-407 (D. Minn.); *United States v. Bruflodt*, 07-cr-389 (D. Minn.).

## HEALTH CONDITIONS/COVID-19 RISK FACTORS

Since this Court sentenced Ruoho, his health has deteriorated. Currently, he has "medically-complicated obesity" (also known as morbid obesity)—at 5'11", he weighs about 350 pounds; obstructive sleep apnea; high cholesterol; and significant orthopedic problems.[3] Just recently, Ruoho has been seen several times for complaints of dizziness, lightheadedness, and heart palpitations; at this point he does not have a heart-related diagnosis other than an enlarged heart. But Ruoho reports that just last week (on May 29), he was transported to a hospital for an EKG and to look into recent high blood pressure. (BOP medical records do not note hypertension as an ailment, but the most recent blood pressure readings in the reports provided to the defense were quite high—164/89 standing, 166/72 sitting (4/13/20).)

Over the course of Ruoho's imprisonment, he has also had a number of other ailments that for now, are resolved or in remission. He has had bladder cancer twice, in 2009 and 2011, that required surgery and chemotherapy. He's been in remission for some time now, but routine testing for recurrence of this commonly recurring cancer is likely the cause of a continuing problem—frequent urinary tract infections. In 2017, Ruoho had acute pancreatitis that was resolved through removal of his gallbladder. In the past, he has also had Hepatitis C and kidney stones, but those have resolved.

---

[3] The BOP has provided the defense (and the Court and presumably the government) with medical records. The records are voluminous, so Ruoho does not file them with this motion.

5

Ruoho's health problems present multiple high-risk factors for COVID-19, including at least one that the CDC clearly and specifically recognizes: morbid obesity.[4] As the CDC explains, "[s]evere obesity increases the risk of a serious breathing problem called acute respiratory distress syndrome (ARDS), which is a major complication of COVID-19 and can cause difficulties with a doctor's ability to provide respiratory support for seriously ill patients."[5] A recent doctor's letter filed in another case involving a obese defendant further explains that with morbidly obese persons, increased abdominal fat prevents lungs from expanding to their full extent, which "limits oxygen exchange and when the person is infected with the virus, the virus is able to overcome any lung reserves quickly, even with additional oxygen." *United States v. Rachuy*, 10-cr-141-jdp, dkt. 326-1 (W.D. Wis. May 11, 2020). Ruoho's sleep apnea is also significant; testing on Ruoho has shown significant oxygen desaturation, and as the doctor in Rachuy's case explained, sleep apnea (even when treated through a C-PAP machine) "causes strain on the cardiovascular system due to poor nocturnal oxygenation." *Id.*

Further, Ruoho's Hepatitis C is a risk factor although after many years of infection he has recovered; as one district court recently recognized, that disease causes permanent damage to the immune system and liver. *United States v. Stephenson*, __ F. Supp. 3d __, 2020 WL 2566760, *1 (S.D. Iowa May 21, 2020).

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-conditions.

[5] *Id.*

6

Ruoho's bladder cancer, if it recurs again, would clearly be another risk factor; and again, bladder cancer has a high rate of recurrence.[6] And he is currently undergoing testing for what appears to be some sort of cardiac issue. Regardless of how that particular testing comes out, it is clear that Ruoho's many health concerns (including seemingly innocuous problems like UTI's and bad knees) present risk: they require frequent medical appointments that prevent him from effectively quarantining, which is relevant to the risk of infection.

As for the risk of infection generally at FMC Rochester, the BOP reports that there are no currently active COVID-19 cases at that institution. But the CDC recognizes that incarcerated persons have a heightened risk of infection because, among other reasons, they "live, work, eat, study, and recreate within congregate environments"; they can't leave the facility even while staff go in and out of the community; and inmates may hesitate to report symptoms due to fear of segregation.[7] FMC Rochester has the benefit of having a lower-than-normal inmate population (currently 668). But its medically vulnerable population, including Ruoho, cannot remain isolated in their cells because of the need for health services. And when and if there is a COVID-19 outbreak at FMC Rochester, there is good reason to be concerned that it will be devastating.[8]

---

[6] https://www.cancer.org/cancer/bladder-cancer/after-treatment/follow-up.html.
[7] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[8] *See* https://www.bop.gov/coronavirus/ (noting that there have been 74 inmate infections and 4 inmate deaths at FMC Lexington; 46 inmate infections and 10 inmate deaths at FMC Fort Worth; 43 inmate infections and 1 inmate death at FMC Devens).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## COMPASSIONATE RELEASE ANALYSIS

The compassionate release statute authorizes the sentencing court to reduce a prisoner's sentence if: "(i) extraordinary and compelling reasons warrant such a reduction" or "(ii) the defendant is at least 70 years of age" and meets other criteria. 18 U.S.C. § 3582(c)(1)(A). In evaluating whether there are extraordinary and compelling circumstances, the Court considers the sentencing guidelines' policy statements *See id.* If there is an extraordinary-and-compelling circumstance, then it consults the § 3553(a) factors to determine whether (and what) reduction is appropriate.

### I.   Ruoho has satisfied § 3582(c)(1)'s exhaustion requirement.

Section 3582(c)(1) requires that an inmate seeking compassionate release "fully exhaust all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden.*" *Id.* § 3582(c)(1)(A) (emphasis added). BOP records provided to undersigned counsel under this Court's recent order on Ruoho's motion for miscellaneous relief confirm that FMC Rochester's warden received Ruoho's request for compassionate release based on his medical conditions and COVID-19 risk on April 3, 2020, which was well over 30 days ago. *See* Att. 1. As of the time of filing this motion, Ruoho has reported to undersigned counsel that he has not received a decision on his request, although a staff member has apparently suggested to him that it would be denied.

## II. This case presents an extraordinary and compelling basis for relief.

Section 3582(c)(1) requires that there be an "extraordinary and compelling reason" for release. Congress delegated the responsibility for determining what could qualify as "extraordinary and compelling reasons" to the Sentencing Commission. *See* 28 U.S.C. § 994(t). The Commission's recommendation appears in commentary to U.S.S.G. § 1B1.13 (the actual policy statement just repeats the statutory language), noting that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and other reasons. *Id.* at app. n.1. It does not limit the "other reasons," but says that it could be any "extraordinary and compelling reason other than, or in combination with" medical conditions, age, or family circumstances. *Id.*[9]

When courts interpret a statute, it gives words their ordinary and accepted meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term

---

[9] The Commission's policy statement is based on the pre-First-Step-Act scheme, under which only the BOP could move for release, so it says that "other reasons" could be anything the BOP deems extraordinary and compelling; post-First Step Act, courts generally have not deferred to the BOP, since the whole point of the amended law is to give more power to sentencing judges, rather than BOP officials. *See, e.g., United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (holding that, given the changes to the compassionate release statute by the First Step Act, U.S.S.G. § 1B1.13, application note 1(D) "no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582."); *United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (holding that application note 1(D) is "inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BOP finds they are not appropriate," and courts thus may "consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement").

goes undefined in a statute, we give the term its ordinary meaning."). *Black's Law Dictionary* defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common." *Black's Law Dictionary* (defining Extraordinary) (11th ed. 2019). It defines "compelling need" as a "need so great that irreparable harm or injustice would result if it is not met." *Black's Law Dictionary* (defining Compelling Need) (11th ed. 2019). Taken together, they constitute the standard this Court should apply: the reason must be "beyond what is usual, customary, regular, or common," and the reasons must be "so great that irreparable harm or injustice would result if the relief is not granted." *See United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019) (applying this approach with an older dictionary); *Beck,* 2019 WL 2716505, at *8 (same).

The situation here is "extraordinary and compelling." COVID-19 represents our country's most significant public health crisis in more than a century, and incarcerated persons have a higher rate of infection than non-incarcerated persons due to their inability to control their own environment—most particularly their inability to socially distance themselves from others. And Ruoho's significant health problems mean that if he contracts COVID-19, he will face a much higher than average risk of serious complications and death. Ruoho's situation is similar to that of Stephen Brown and Gale Rachuy, both morbidly obese inmates with associated health problems who Judge Peterson recently ordered released. Order, *United States v. Rachuy*, 10-cr-141, dkt. 329 (W.D. Wis. May 15, 2020); Opinion and Order, *United States v. Brown*, 18-cr-56, dkt. 67 (W.D. Wis. May 5, 2020). Ruoho

10

does not have COPD or diabetes (although he has pre-diabetes) and at 53, he is younger than Brown and Rachuy, but then Ruoho has a history of cancer and Hepatitis C and he also has new, as-yet-undiagnosed problems (dizziness, lightheadedness, palpitations) that could be more safely diagnosed and treated in the community. Just like Brown and Rachuy, Ruoho's COVID-19 risk presents an extraordinary and compelling basis for relief.

Beyond this district, of course, courts around the country have agreed that the risk of infection and death from COVID-19 in cases presenting comorbidities amounts to an "extraordinary and compelling" reason for release from prison—the list of cases grows daily.[10] And in other parts of the country, at least, the

---

[10] *See, e.g., United States v. Young*, 2020 WL 2614745, at *3 (W.D. Wash. May 22, 2020) ("Young establishes a compelling reason because of his age and his underlying health issues, which places him in a high-risk category for death if he contracts the virus."); *United States v. Stephenson*, 2020 WL 2566760, at *6 (S.D. Iowa May 21, 2020) ("the particularized risks of COVID-19 cut in favor of extraordinary and compelling reasons supporting compassionate release"); *United States v. Perez*, __ F. Supp. 3d __, 2020 WL 1546422, *4 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Rodriguez*, __ F. Supp. 3d __, 2020 WL 1627331, **1–2 (E.D. Penn. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Gonzalez*, No. 2:18- cr-232-TOR, R. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"); *United States v. Marin*, No. 15-cr-252, R. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States v. Muniz*, Case No. 4:09-cr-199, R. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, R. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody").

11

government has conceded that given the current global crisis, an underlying health condition that is a recognized risk factor for COVID-19 presents an extraordinary and compelling basis for relief.[11]

That does not mean, of course, that every inmate with a COVID-19 risk factor must be released. But it does mean that this Court turns to the familiar § 3553(a) factors to determine whether and how much, to reduce Ruoho's sentence as a matter of discretion.

---

[11] *See, e.g.*, Government's Response, *United States v. Feucht*, 0:11-cr-60025, ECF 51 (S.D. Fla. May, 26, 2020) ("The Government acknowledges that during the current COVID-19 pandemic, an inmate who presents one of the CDC risk factors, which include diabetes, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason that would allow compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release."); Government's Response, *United States v. Hird*, 2:13-cr-0039-TJS, ECF 650 (E.D. Pa. May 19, 2020) ("The government acknowledges that the risk of COVID-19 presents 'a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility,' as stated in note 1(A), as, due to his comorbidities, the defendant may be less able to protect himself against an unfavorable outcome from the disease."); Letter Amending Government's Response, *United States v. Wise*, 1:18-cr-00072-ELH, ECF 185 (D. Md. May 18, 2020) ("consistent with current DOJ policy, the Government does not contest the Defendant's eligibility for being considered for compassionate release in this case because he suffers from a condition identified by the CDC as putting him at higher risk for severe illness."); Supplemental Response, *United States v. Wright*, 8:17-cr-00388-TDC, ECF 50 (D. Md, May 19, 2020) ("the Government concedes that the defendant's Type I diabetes, and perhaps other of her medical conditions, constitute 'extraordinary and compelling circumstances' during the pandemic, even if these conditions in ordinary times would not allow compassionate release."); Government's Response, *United States v. Blystone*, 5:14-cr-00172-DAE, ECF 518 (W.D. Tex. May 14, 2020) ("Under the fact-specific circumstances of this case, the government does not dispute that Defendant has met the threshold requirement of showing 'extraordinary and compelling reasons' favoring release, § 3582(c)(1)(A)(i). Defendant's medical records show that she is severely obese, with a Body Mass Index exceeding 40. Although that condition would ordinarily be insufficient to establish an 'extraordinary and compelling reason' for release, it has been identified by the CDC as elevating her risk of becoming seriously ill from COVID-19.").

12

**III.     The § 3553(a) factors favor release.**

Given that Ruoho's health condition and risks during the current pandemic qualify as "extraordinary and compelling," this Court has discretion to reduce his sentence for compassionate reasons, upon consideration of the § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A); *see also* U.S.S.G. § 1B1.13(2) (beyond the need for an "extraordinary and compelling reason," instructing courts to determine whether "the defendant is not a danger to the safety of any other person or to the community"). In weighing those factors, the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." *Id.* § 3553(a)(2). Looking at those factors here, in the midst of the current pandemic, there is no reason to keep Ruoho in prison any longer. That is also to say: granting him compassionate release would not undermine the purposes of sentencing.

Ruoho has already served well over half his sentence. True, he still has a long way to go, since the Court imposed a 336-year sentence. But the sentence that Ruoho has already served satisfies the goals of sentencing in this non-violent drug case, and no more is required. As for punishment, no one can doubt that Ruoho has been well and thoroughly punished; his lengthy attached letter to the court (which was long enough that it was sent in three emails to undersigned counsel) describe his hardships in prison along with his efforts to better himself. Att. 2.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

While serving this sentence, Ruoho has lost his mother and his sister.[12] And Ruoho, always a loving and devoted father, has missed watching his children grow up; they were 5 and 8 when he went to prison, now they're adults. *See* PSR ¶¶96–99. Ruoho's step-daughter, who was like a daughter to him, now has kids of her own. And Ruoho himself has aged, and grown less and less healthy, fighting and beating cancer twice, only to have continuing, serious health problems, while locked up far from family and others who love him.

Ruoho's drug offense was a serious one, and he deserved significant punishment for it, but it was not violent and does not cry out for more punishment than he's already had. He was a leader of the drug conspiracy but there were two other leaders and, as noted in the "background" section, above, both of them escaped prosecution for their role in the conspiracy; and although they were convicted in drug cases out of the District of Minnesota, they were released from prison for those offenses long ago. Every defendant's case is different, of course, and at least one of the other leaders acted as a government cooperator. Perhaps the other leader did too, just not in relation to this case. But then Ruoho at least tried to cooperate with the government too. As noted above, he complained to the Court in the past that his lawyer had not helped him in his efforts to give information to the government and obtain a sentence reduction.

---

[12] As Ruoho notes in his letter, he has now lost both of his sisters to heart problems—both when they were younger than he is now. His sister Lynn died before he was sentenced in this case; now Laura has died as well.

14

And this is certainly believable: this was the same lawyer who frivolously contested U.S.S.G. § 2D1.1's firearm enhancement, depriving Ruoho of an acceptance-of-responsibility reduction that he'd anticipated; who did not challenge Ruoho's criminal history score; and who was later disbarred. If Ruoho's lawyer had not contested the enhancement and had challenged the criminal history score, then post-guideline-amendment, Ruoho would have had a reduced guideline range of 262–327 months. To a large extent, this is all water under the bridge now—the Court can't undo what Ruoho's lawyer argued at sentencing. But in exercising discretion to reduce Ruoho's sentence, it is entirely appropriate for the Court to consider that circumstances beyond Ruoho's control contributed to his very high guideline range and thus to his very high sentence.

Turning to protection of the public, that is not as significant of a factor. Ruoho's offense ended several years before he was prosecuted here, and as this Court found at sentencing, he'd lived a law-abiding life in the interim; he was even released from detention until the plea hearing in this case, and did well. R.38 at 4. He'd seen former confederates get prosecuted, and that was already an effective deterrent; his long period of incarceration since then has served as more deterrent. Moreover, Ruoho has never committed any violent crime, and even while he was involved in a drug conspiracy, he was a relatively successful carpenter and much loved family man. PSR ¶¶97–99, 117–19; *see also* Att. 3 (letters from friends and family in support of release). Further, Ruoho has aged out of the criminal

15

tendencies he once had; he committed his offense when he was in his 30s but now he's in his 50s, and not healthy.

As for behavior in prison, Ruoho has done well. His letter to the Court discusses the three disciplinary reports he's garnered over the years in order to provide context and details. The bottom line is that while his record is not spotless—he was caught with a "stinger" for cooking food in his cell,[13] communicated with an inmate in the SHU about some hand-me-down clothes, and passed a note between inmates—he has not engaged in violence, or alcohol/drug use, or any other activities that would cause the Court to be concerned about his ability to confirm his actions to society's rules upon release.

Finally, turning to rehabilitation, Ruoho has worked hard to make the best of his time in prison. As he explains in his letter, even with his serious health conditions, he has continued to work as a carpenter and completed a carpentry apprenticeship, he has taken numerous educational courses, and he's helped as a suicide prevention volunteer. *See also* R.47-3 (prison records filed in 2014). He has tried to lose weight too—dieting and taking aerobics courses—but as he explains in his letter, this has been a terrible struggle. He says that union reps have visited the prison and told him that his carpentry skills could result in a good-paying job right out of prison, and he hopes for the opportunity to put his skills to use in the

---

[13] *See* https://www.thrillist.com/eat/nation/the-fine-art-of-cooking-in-prison-ingenious-jailhouse-cooking-hacks

community to help support his family, and continue his rehabilitation and efforts at self-improvement in the community.

Thus, although Ruoho still has many years to go on the sentence that was imposed in 2008, the § 3553(a) factors, particularly when viewed together with Ruoho's serious health conditions and the current pandemic, point to "time served" as the appropriate sentence.

### IV. Ruoho's release plan is solid.

Undersigned counsel has submitted a release plan to the probation office, including the relevant address and phone numbers for verification, and it is solid and straightforward. Upon release, he will live with his girlfriend/fiancé/ common-law-wife Jackie Knudson, with whom he lived while he was released pretrial in this case. Knudson lives in Baldwin, Wisconsin (in the Western District), in a townhouse she's had for about 13 years. Knudson currently lives with her mother Diane Perez and Ruoho and Knudson's daughter Nakeyah, although Nakeyah may be moving out soon in order to start nursing school. Knudson has reported that she has adequate space for Ruoho to self-isolate when he comes home, to reduce the risk of him bringing COVID-19 from the prison to their home, although (as noted) FMC Rochester currently has no positive COVID-19 cases. Perez was just recently diagnosed with terminal liver cancer, and Ruoho looks forward to the opportunity to make amends for his long absence from his family by helping Knudson take care of her mother, as he sometimes helps out patients at FMC Rochester, in her remaining days.

Ruoho's brother Paul Ruoho is able to pick Ruoho up at the prison and take him home to Knudson's house.

Ruoho anticipates getting health coverage through Medicaid to cover his medical expenses, and various family members are willing and able to help him with transportation and other reentry needs upon release.

## CONCLUSION

Wayne Ruoho has presented his claims to the warden at FMC Rochester and waited the 30 days—exhaustion is not an issue here. And he clearly has health conditions that present as comorbidities for COVID-19, presenting an extraordinary and compelling basis for relief under § 3582(c)(1). The real question here is whether the Court as a matter of discretion will choose to reduce Ruoho's sentence. Given that the § 3553(a) factors support release, Ruoho respectfully asks the Court to reduce his sentence to time served.

Dated at Madison, Wisconsin, this 1st day of June, 2020.

> Respectfully submitted,
> WAYNE RUOHO
>
> /s/ Shelley M. Fite
> Shelley M. Fite

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, WI 53703
Tel: 608-260-9900
Fax: 608-260-9901
shelley_fite@fd.org